## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| HOP-A-JET WORLDWIDE JET CHARTER INC., ACE AVIATION SERVICES CORP., and EAST SHORE AVIATION, LLC, on behalf of themselves and all others similarly situated, | **CASE NO.:** |
| | |
| *Plaintiffs*, | **CLASS ACTION COMPLAINT** |
| | |
| v. | |
| | **JURY TRIAL DEMANDED** |
| GENERAL ELECTRIC COMPANY, GE AEROSPACE, BOMBARDIER, INC., BOMBARDIER AEROSPACE CORP., LEARJET, INC., TURBINE ENGINE SPECIALISTS, INC., AND DUNCAN AVIATION, INC. | |
| | |
| *Defendants*. | |
| _____/ | |

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs, Hop-A-Jet Worldwide Jet Charter, Inc. ("Hop-A-Jet"); Ace Aviation Services Corp. d/b/a Hop-A-Jet ("Ace Aviation"); and East Shore Aviation, LLC ("East Shore") (together, "Plaintiffs") file this Complaint on behalf of themselves, and all other similarly situated, against General Electric Company; GE Aerospace (together, "GE"); Bombardier, Inc. ("Bombardier"); Bombardier Aerospace Corp. ("Bombardier Aerospace"); Learjet, Inc. ("Learjet"); Turbine Engine Specialists, Inc. ("Turbine Engine Specialists"); and Duncan Aviation, Inc. ("Duncan Aviation").

1

## INTRODUCTION

1.      On February 9, 2024, Hop-A-Jet's plane with GE CF34-3B engines suffered a catastrophic "dual engine failure" that claimed the lives of its two expert pilots, Edward Daniel Murphy and Ian Frederick Hofmann (together, the "Pilots") and resulted in a total loss of the aircraft when the Pilots made an emergency landing on I-75 ("Subject Incident").



2.      The Hop-A-Jet pilots' heroic landing undoubtedly saved the lives of the two passengers, and Hop-A-Jet flight attendant, on board and countless drivers and pedestrians on the makeshift landing strip. It is now evident that this engine failure was caused directly by an inherent defect in this family of GE engines. Much worse, GE knew about this specific engine defect (corrosion to this family of engines) for many years, and in fact, took efforts to cover it up by hiding incriminating evidence (such as video of the GE secret inspection). Finally, this is not the first time GE decided to make substandard parts, which put many lives at risk.

---

[1] https://x.com/Karli_VanCleave/status/1756825871636217959. A dashcam video of the crash can also be found here: https://www.youtube.com/watch?v=XMzZVJRNQ48&rco=1/.

3.      This Federal Class Action is brought: (1) to help organize and consolidate all actions resulting from this GE disaster, (2) provide an avenue for Hop-A-Jet (and plaintiffs) to recover any and all of their direct damages (that are now in the hundreds of millions of dollars) from those responsible, and (3) finally require GE to provide adequate Notice to all purchasers of these specific family of GE engines, so another tragedy can be avoided.

4.      Counts in **Section A** (below) are brought by Plaintiffs individually, <u>and as proposed Class Representatives</u>, on behalf of all similarly situated GE engine purchasers, and Counts in **Section B** (below) are brought by Plaintiffs, only in their individual capacity.

5.      At this stage, Plaintiffs as the proposed Class Representatives, seek two class claims solely for injunctive relief under Rule 23(b)(2), and none for any monetary damages.

6.      The cause of the catastrophe was a "non-recoverable dual rotating compressor stall" arising from corrosion to the variable guide vane ("VGV") systems[2] of the CF34-3B engines powering the aircraft. GE designed and manufactured its CF34 family of engines without external lubrication access and with restricted inspection capability that increased the risk of VGV corrosion and allowed VGV corrosion to go undetected and if detected to be unreported.

7.      GE has had actual knowledge, at the latest in 2019, that the family of CF-34 engines, are susceptible to corrosion of specific components of the VGV System. Instead of informing Class Members of the risks and enhanced maintenance and inspection procedures that could mitigate risks of engine failure, GE instead covered up the issue and even revised its OnPoint service contracts to exclude full corrosion coverage.

---

[2] The VGV system consists of adjustable guide vanes in the engine's compressor section that regulate airflow and maintain optimal engine performance across different operating conditions. Proper movement of the VGVs is essential to prevent compressor stalls, hung starts, and other power losses; corrosion or binding in this system can result in loss of thrust or complete engine failure

8.      These types of actions are not new for the General Electric Company. In 2023, "GE Aerospace, an operating division of the General Electric Company, … agreed to pay $9,413,024 to resolve allegations that its Lynn, Mass. manufacturing plant (GEA Lynn) sold parts to the United States Army and the United States Navy that were either not properly inspected or were nonconforming, in violation of the False Claims Act."[3]

9.      The U.S. Department of Justice alleged that GE knowingly failed to conduct required inspections on *aircraft engine parts*, including curvic feature inspections, failed to consistently use function gauges to inspect features on certain parts, and delivered engines containing nonconforming and defective components. *Id.*

10.     Similarly, in 2006, "General Electric Co. (GE) and two of its subcontractors … paid the United States $11.5 million to settle a lawsuit that alleges that GE sold *defective blades* for engines in U.S. military airplanes and helicopters…"[4]

11.     "The lawsuit alleged quality-control problems over a period of years involving the manufacture of several types of engine blades at GE's Aircraft Engines division facility in Madisonville, Ky. These alleged problems included nonconformances in casting and in non-destructive testing." *Id.*

## PARTIES

12.     Plaintiff Hop-A-Jet is a Delaware corporation with its principal place of business in Fort Lauderdale, Florida. It manages and operates a fleet of business aviation aircraft for on-demand charter use.

---

[3]   https://www.justice.gov/usao-ma/pr/ge-aerospace-agrees-pay-94-million-resolve-allegations-false-claims-act-violations

[4]   https://www.justice.gov/archive/opa/pr/2006/July/06_civ_457.html#:~:text=%E2%80%9CThis%20lawsuit%20is%20an%20excellent,the%20Western%20District%20of%20Kentucky.

13.     Plaintiff Ace Aviation is a Florida corporation with its principal place of business in Fort Lauderdale, Florida. As a wholly owned subsidiary of Hop-A-Jet, Ace Aviation holds an air carrier certificate under Part 135 of the Federal Aviation Regulations and is authorized to conduct commercial flight operations.

14.     Plaintiff East Shore is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida. At the relevant time, East Shore held the title and FAA registration to N823KD.

15.     Defendant General Electric Company is a New York corporation with its principal place of business in Ohio. It maintains a registered agent at 1200 S. Pine Island Road, Plantation, Florida 33324. GE transacts substantial business in Florida through the design, manufacture, distribution, and sale of aircraft engines and component parts—materials used in Florida in the ordinary course of trade, commerce, or use. General Electric Company is a foreign corporation that designs, manufactures, tests, markets, sells, and services aircraft engines. It also prepares and updates the manuals, instructions, and service bulletins for those engines.

16.     Defendant GE Aerospace is a New York corporation with its principal place of business in Ohio. GE Aerospace is a foreign corporation that designs, manufactures, tests, markets, sells, and services aircraft engines. It also prepares and updates the manuals, instructions, and service bulletins for those engines. GE Aerospace has no independent corporate identify from General Electric Company.

17.     General Electric Company and GE Aerospace are collectively referred to herein as "GE."

18.     Defendant Bombardier is a Canadian corporation with its principal place of business in Montreal, Quebec, Canada. It transacts substantial business in Broward County,

Florida, through the operation of an aircraft maintenance facility at the Fort Lauderdale-Hollywood International Airport.

19.     Defendant Bombardier Aerospace is a Delaware corporation with its principal place of business in Kansas. It maintains a registered agent at 1200 South Pine Island Road, Plantation, Florida 33324. It transacts substantial business in Broward County, Florida, through the operation of an aircraft maintenance facility at the Fort Lauderdale-Hollywood International Airport.

20.     Defendant Learjet is a Kansas corporation with its principal place of business in Kansas. It maintains a registered agent at 1200 S. Pine Island Road, Plantation, FL 33324. It transacts substantial business in Broward County, Florida, through the operation of an aircraft maintenance facility at the Fort Lauderdale-Hollywood International Airport.

21.     Defendant Turbine Engine Specialists is a Texas corporation with its principal place of business in Texas. Turbine Engine Specialists transacts substantial business in Palm Beach County, Florida, through operation of a field service program that employs Florida-based technicians and mechanics that specialize in troubleshooting, inspecting, and repairing aircraft engines like those at issue in this lawsuit.

22.     Defendant Duncan Aviation is a Nebraska corporation with its principal place of business in Nebraska. It maintains a registered agent at 1200 S. Pine Island Road, Plantation, Florida 33324. Duncan Aviation transacts substantial business in Broward County through the operation of a maintenance shop at the Fort Lauderdale Executive Airport for business aircraft, as well as a 24/7 "Rapid Response" team of Florida-based maintenance technicians that focuses on aircraft engines and auxiliary power units. Duncan Aviation's Fort Lauderdale maintenance shop, and/or its Rapid Response team, performed some of the negligent maintenance tasks described herein in the course of ordinary business.

6

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because at least one class member is a citizen of a State different from the Defendants, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

24.     This Court has personal jurisdiction over Defendants because they have sufficient minimum contacts with Florida, conduct substantial and not isolated business in Florida, and/or have otherwise intentionally availed themselves of the Florida market through the promotion, marketing, sale and service of CF34 engines in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants or related entities permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District under 28 U.S. C. § 1391 because Plaintiffs reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

26.     All conditions precedent to the maintenance of this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### Hop-A-Jet and Ace Aviation

27.     Hop-A-Jet, through Ace Aviation, manages and operates a fleet of business aviation aircraft, primarily for charter use. Since their founding, Hop-A-Jet and Ace Aviation have worked together to transport tens of thousands of passengers to destinations around the globe in a safe and professional manner.

7

28.     Hop-A-Jet, Ace Aviation, and East Shore are based at the Fort Lauderdale Executive Airport.

**<u>Serial No. 5584</u>**

29.     In November 2022, East Shore purchased a Challenger 604 aircraft, serial 5584 (herein "the Subject Aircraft"), and leased such to Hop-A-Jet and Ace Aviation for charter operations.

30.     The Subject Aircraft was designed, manufactured, assembled, produced, inspected, tested, certified, warranted, and approved by Bombardier and/or Bombardier Aerospace.

31.     In March, 2019, Bombardier and/or Learjet conducted a 3,200 hour inspection of both engines and contracted with Turbine Engine Specialists to perform borescopes of both engines which were performed in accordance with GE's defined workscope. The borescope revealed evidence of corrosion on the compressor cases surrounding the bushing bore holes of the VGV System. Neither the engine logbook entries, the TES report nor Bombardier's report mentions the existence of corrosion.

32.     On or about November, 2020, the owner of the Subject Aircraft entered into a conditional agreement to sell the Subject Aircraft with a prospective purchaser. A condition of the sale was the performance of a pre-purchase inspection comprised of a 192 month airframe inspection and a borescope[5] of both engines to be performed by Duncan Aviation, an FAA approved repair station and GE authorized engine borescope facility.

---

[5] A borescope inspection is a non-destructive procedure in which a small optical device or camera is inserted into the engine through access ports, allowing mechanics to visually examine internal components—such as turbine blades, compressor sections, and variable guide vanes—for corrosion, cracking, or other damage without disassembling the engine.

33.     Duncan Aviation commenced the pre-purchase inspection in November, 2020 and returned the aircraft to service on March 1, 2021. The borescope of the engines conducted by Duncan Aviation during the prepurchase inspection revealed evidence of corrosion on the compressor cases surrounding the bushing bore holes of the VGV System.

34.     The 192-month inspection revealed evidence of corrosion to various components of the airframe. Duncan Aviation reported and subsequently rectified the airframe corrosion, but did not report the evidence of corrosion to the VGV System of the engines in its report nor in the engine logbook entries made by Duncan Aviation. The engines were cleared by Duncan Aviation with no discrepancies.

35.     The prospective purchaser of the Subject Aircraft did not complete its purchase of the aircraft and following completion of the pre-purchase inspection and rectification of the reported airframe corrosion, Hop-A-Jet purchased the Subject Aircraft from the original owner in March, 2021.

36.     Hop-a-Jet was not made aware of the evidence of corrosion on the compressor cases surrounding the bushing bore holes of the VGV System and relied on the engine logbook entries made by Duncan Aviation clearing the engines as airworthy.

37.     Both CF34-3B engines on the Subject Aircraft were designed, manufactured, assembled, produced, inspected, tested, certified, warranted, and approved by GE. According to GE, CF34-3B engines are a variant of engine within the "CF34 family of engines."

38.     The Number 1 engine on the Subject Aircraft was Engine Serial Number 950105, and the Number 2 engine was Engine Serial Number 950106. They were both installed new onto the Subject Aircraft on May 14, 2004. Upon information and belief, various components of these

engines may have been repaired or replaced during routine maintenance on the Subject Aircraft from installation through to the Subject Incident.

39.     East Shore purchased the Subject Aircraft from Hop-A-Jet in November 2022. East Shore relied on the entries made by Duncan Aviation into the engines' logbooks certifying that the engines were airworthy as being factual when they were made.

40.     Upon information and belief, GE, Bombardier, and/or Bombardier Aerospace specifically warranted, through express representation or labeling, that the Subject Aircraft (including but not limited to its engines) has an expected useful life far in excess of twenty (20) years.

41.     GE Engine Services is a subsidiary of GE that supports the maintenance and continued operation of CF34 engines. As described on GE's website, the services provided by GE Engine Services reflect "OEM" (original equipment manufacturer) "knowledge," "optimized configuration," "the experience of GE Aerospace's entire fleet, direct connection with . . . supply chain sources, and world-class field and services support."

**CF34 Engines**



10

42.    The CF34 Engine Family is comprised of the CF34-3, the CF34-8C, CF34-8E, CF34-10A, and the CF34-10E turbofan engines.[6] It is the most widely used and best-selling engine family worldwide in the 70 to 100 seat aircraft segment.[7] The CF34 program was announced by GE in April of 1976.[8]

| PHYSICAL INFORMATION | CF34-3 | CF34-8C | CF34-8E | CF34-10A | CF34-10E |
|---|---|---|---|---|---|
| Fan/Compressor Stages | 1/14 | 1/10 | 1/10 | 1/3/9 | 1/3/9 |
| Low-Pressure Turbine / High-Pressure Turbine | 4/2 | 4/2 | 4/2 | 4/1 | 4/1 |
| Maximum Diameter (Inches) | 49 | 52 | 53.3 | 57 | 57 |
| Length (Inches) | 103 | 128 | 121.2 | 90 | 145.5 |
| Max Power at Sea Level | 9,220 | 13,790 | 14,510 | 18,285 | 20,000 |
| Overall Pressure Ratio at Max Power | 21:1 | 28:1 | 28.5:1 | 29:1 | 29:1 |

43.    "The CF34-10E powers both Embraer's 190/195 and Lineage 1000 aircraft. The CF34-10A powers the COMAC C909 regional jet."[9] These are "larger and longer-range regional jets.". "The CF34-8E powers the Embraer E170/175 regional jets. The CF34-8C powers the CRJ series of regional jets." *Id.*

44.    "The CF34-3 engine is the sole-sourced engine on the best-selling large business jet platform, Challenger 650 business jet. It also powers the CRJ200 regional airliner. [...] GE Aerospace's CF34-3 engine started out in military as the TF34, most famously on the A-10 in the early 1970s. Since its service entry in 1992 on the Challenger 601, the CF34-3 engine has earned an industry-leading reputation as one of the cleanest and most fuel-efficient engines in its class, while being synonymous with reliability." *Id.*

---

[6] https://www.geaerospace.com/commercial/aircraft-engines/cf34

[7] https://www.mtu.de/engines/commercial-aircraft-engines/narrowbody-and-regional-jets/cf34-8/-10e/

[8] https://tealgroup.com/images/TGCTOC/sample-babeng.pdf

[9] https://www.geaerospace.com/commercial/aircraft-engines/cf34



45.     The CF34 Family is used in the following aircrafts:[10]

| Engine | Aircraft |
|---|---|
| CF34-1A | American Aviation FanStar (prototype aircraft; JetStar conversion)<br>Bombardier Challenger 601-1A |
| CF34-3A | Bombardier Challenger 601-3A |
| CF34-3A1 | Bombardier Challenger 601-3R<br>Bombardier Challenger 604<br>Bombardier Challenger 800 (initial version)<br>Bombardier CRJ100 |
| CF34-3A2 | Bombardier Challenger 601 (engine upgrade) |
| CF34-3B | Bombardier Challenger 604 |
| CF34-3B1 | Bombardier Challenger 604<br>Bombardier Challenger 605<br>Bombardier Challenger 800<br>Bombardier Challenger 850<br>Bombardier CRJ200<br>Bombardier CRJ200B (optional hot-and-high -3B1 variant)<br>Bombardier CRJ200B ER (optional hot-and-high -3B1 variant)<br>Bombardier CRJ200B LR (optional hot-and-high -3B1 variant)<br>Bombardier CRJ200ER<br>Bombardier CRJ200LR<br>Bombardier CRJ440 |

---

[10] https://tealgroup.com/images/TGCTOC/sample-babeng.pdf

| | |
|---|---|
| CF34-3B MTO | Bombardier Challenger 650 |
| CF34-8C1 | Bombardier Challenger 870<br>Bombardier CRJ700<br>Bombardier CRJ701 |
| CF34-8C5A1 | Bombardier CRJ1000 |
| CF34-8C5A2 | Bombardier CRJ1000 |
| CF34-8C5B1 | Bombardier Challenger 890<br>Bombardier CRJ705<br>Bombardier CRJ900 |
| CF34-8E5A1 | Embraer E-170<br>Embraer E-170 LR<br>Embraer E-170 STD<br>Embraer E-175 AR<br>Embraer E-175 LR<br>Embraer E-175 STD |
| CF34-10 | Boeing B-52H (proposed re-engining) |
| CF34-10A | COMAC ARJ21-700 |
| CF34-10D | Fairchild Dornier 928 (canceled) |
| CF34-10E5 | Embraer E-195 AR<br>Embraer E-195 LR<br>Embraer E-195 STD |
| CF34-10E5A1 | Embraer E-190 AR<br>Embraer E-190 LR<br>Embraer E-190 STD |

**TF34 Engines**



46.     The TF34 engine is the military equivalent of the CF34. It is used on the Fairchild Republic A-10 for the U.S. Air Force, commonly known as the A-10 Warthog, and was used on the Lockheed Martin S-3 Viking for the U.S. Navy, which has been retired.

47.     Preceding the CF34, the TF34 started development in 1965 and flew for the first time in 1971.[11] "Since entering service in the 1970s, 2,100 TF34 engines have accumulated a total of more than 13 million engine flight hours spanning combat and peace time missions." *Id.*

48.     The TF34 is used in the following aircrafts:[12]

| Engine | Aircraft |
|---|---|
| TF34-GE-100 | Fairchild A-10A |
| TF34-GE-101 | Fairchild A-10C (engine upgrade kits were scheduled for 2009) |
| TF34-GE-400A | Lockheed Martin S-3 |

---

[11] https://tealgroup.com/images/TGCTOC/sample-babeng.pdf

[12] https://tealgroup.com/images/TGCTOC/sample-babeng.pdf

| TF34-GE-400B | Lockheed Martin S-3 |
|---|---|

49.     TF34 engines use a High Pressure Compressor with an identical variable geometry system as the CF34 family.

### GE'S On-Condition Maintenance Program is Inadequate

50.     Starting with the Challenger 601-3R model and until current day, all CF34 engines are designated the On-Condition maintenance status.

51.     Initially, CF34 engines were on the Time Between Overhaul ("TBO") program, where every 6,000 hours a hard overhaul is done on the engines. However, Bombardier and GE petitioned the FAA to switch the engines to On-Condition, allowing Bombardier and GE the great financial benefit of being able to market their airplanes and their engines as On-Condition.

52.     GE's On-Condition maintenance program for the CF34-3B relies almost entirely on borescope checks, done every 3,200 hours.

53.     One specific issue with the borescope tests, which are foundational to the On-Condition program, is that due to the defects explained in the section below, borescopes cannot detect corrosion of the *boreholes* in the VG system, where corrosion develops unnoticed and can lead to the failure seen here.

54.     The borescope inspections are inadequate for detecting corrosion that develops inside boreholes and hidden VG components.

55.     For example, a test such as the Maintenance Procedure 68 (MP 68) MP68[13] check could have provided proper evaluation and allowed safe extension beyond 6000 hours, but GE does not include such methods.

56.     If Plaintiff's aircraft had not been placed on GE's flawed On-Condition program, the engines would have been overhauled at the mandated interval, the corrosion would have been discovered, and the Subject Incident would have been avoided.

57.     Since the 3200 hour On-Condition inspection is inadequate to find defects of many types, such as the corrosion here, CF34 engines are allowed to stay in service essentially until failure occurs, which may be airborne and deadly.

58.     The On-Condition program was flawed in its conception and rollout to the entire industry. GE promoted this program as reliable when it cannot catch critical failure modes that GE knew or should have known were possible, in the interest of placing cost savings and marketing ahead of safety.

**The Variable Guide Vane System in the CF34 Engine Family is Defective**

59.     The CF34 family of engines GE manufactured all include a substantially identical VGV system located in the compressor section. The VGV system regulates the airflow entering the compressor by adjusting the angle of guide vanes in response to engine power settings.

60.     Proper functioning of the VGV system is critical to preventing compressor stalls, surges, and rollbacks during engine acceleration and deceleration. If the VGV system seizes or binds due to corrosion, the vanes can become stuck in an improper position, resulting in rotating stalls and ultimately a loss of thrust, as occurred in the Subject Incident.

---

[13] Maintenance Practice 68 ("MP68") is the procedure designed to detect corrosion-induced binding in the VGV system.

61.     The VGV system contains multiple bushings, bearings, vane bores, and linkages requiring periodic lubrication and inspection to ensure free movement. Without adequate maintenance access or warnings, corrosion can accumulate, leading to binding and catastrophic engine failure.

62.     In the CF34 family of engines, the VGV system is difficult to access for routine inspection and lubrication because GE designed the assembly with sealed, non-serviceable bushings and without external lubrication points.

63.     GE's maintenance manuals and service instructions do not provide operators with procedures to easily clean, lubricate, or test the VGV components for corrosion unless specialized tooling and disassembly procedures—available only to GE or its authorized vendors—are used.

64.     This design choice places the entire burden of corrosion detection and prevention on major shop visits rather than allowing line maintenance crews to perform preventative lubrication or movement checks between overhauls.

65.     By contrast, other turbine engine manufacturers, including Rolls-Royce, have long incorporated accessible lubrication points, removable inspection covers, and simplified VGV actuation systems in their engines, enabling operators to:

    a.  Apply corrosion-inhibiting lubricants at routine maintenance intervals;

    b.  Perform quick, on-wing movement tests of VGV actuation without specialized tooling; and

    c.  Detect binding or sluggish vane movement before it reaches a critical safety threshold.

66.     For example, Rolls-Royce engines in the same thrust class incorporate external grease fittings and modular VGV linkages specifically designed for on-wing servicing, dramatically reducing the risk of corrosion-induced seizure between scheduled overhauls.

67.     GE's failure to incorporate similar accessible, service-friendly designs in the CF34-3B and other CF34 engines deprived operators of basic preventative measures that the broader aviation industry recognizes as standard practice for minimizing VGV corrosion risks.

68.     GE knew or should have known that the lack of external lubrication access and restricted inspection capability increased the risk of VGV corrosion but failed to warn operators, redesign the system, or provide post-sale instructions comparable to those routinely provided by other engine manufacturers.

69.     Despite differences in thrust rating, intended aircraft platforms, and certification basis, the VGV systems in all CF34 family engines use substantially identical components, materials, actuation mechanisms, and lubrication interfaces. The corrosion-prone bushings, bearings, bores, and linkages in the VGV assemblies across all variants are designed and manufactured using the same engineering specifications, with no material differences in corrosion protection, accessibility for inspection, or preventative maintenance features.

70.     As a result, the same corrosion-induced binding and seizure defect that caused the catastrophic dual-engine failure in the Subject Aircraft exists across the entire CF34 engine family. GE has long been aware that the design uniformity of the VGV system means corrosion risks identified in one variant—such as the CF34-8—necessarily apply to all related variants, including the CF34-3B engines powering the Subject Aircraft.

71.     Although GE knew or should have known that the VGV systems in all CF34 engines share a common design and identical corrosion vulnerability, GE issued limited and

narrow service bulletins and safety communications limited only to certain engine variants, such as the CF34-8, while deliberately omitting the CF34-3B and other variants with the same VGV architecture.

72.     By narrowly tailoring these warnings, GE created a false impression for operators, maintainers, and pilots of CF34-3B-powered aircraft that the corrosion-induced binding hazard applied only to other engine variants, when in fact the design uniformity across all CF34 engines meant that the risk was universal and foreseeable.

73.     GE's selective warnings deprived operators of critical safety information, prevented timely inspections and maintenance interventions, and allowed engines with identical defects to remain in service without the remedial measures GE mandated for other CF34 variants. This conduct demonstrates GE's failure to act with reasonable care in discharging its post-sale duty to warn and its reckless indifference to public safety despite knowledge of the catastrophic risks posed by VGV seizure.

**GE, Bombardier, and Bombardier Aerospace knew of the defects and/or dangerous conditions in CF34 engines, concealed them, and failed to warn Class Members like Plaintiffs.**

74.     GE, Bombardier, and Bombardier Aerospace knew or should have known years before the Subject Incident that defects and/or dangerous conditions existed in CF34 engines, including but not limited to the Subject Aircraft. They knew this information because each entity collects and shares (internally) significant performance and maintenance data regarding the CF34 family of engines.

75.     GE had actual knowledge of corrosion-induced binding in the VGV system across the CF34 engine family and its foreseeable risk of catastrophic dual-engine failure.

76.     Although GE, Bombardier, and Bombardier Aerospace knew or should have known that defects and/or dangerous conditions existed in engines within the CF34 family of engines—including those CF34-3B engines on the Subject Aircraft—they did not communicate or warn owners, operators, or users of CF34-3B engines. Nor did GE, GE Bombardier, or Bombardier Aerospace warn governmental authorities or maintenance providers of CF34-3B engines of the defects and/or dangerous conditions.

77.     GE internally acknowledged corrosion risks through engineering reports, maintenance data, and operational findings but failed to disclose this information to the FAA, operators, or maintainers in a timely or complete manner.

78.     Bombardier failed to include even the most rudimentary preventative maintenance procedures recommended by GE from time to time in the engine maintenance program published by Bombardier in its Chapter 5. Chapter 5 refers to the manufacturer's Time Limits and Maintenance Checks (TLMC) and is a standardized numbering system utilized by Original Equipment Manufacturers (OEMs) to ensure consistent documentation across manufacturers. Ace has incorporated the Bombardier TLMC into its FAA approved Maintenance and Inspection Program (MIP), which is a separate volume of the FAA accepted General Maintenance Manual (GMM), which Ace is required to follow.

79.     At all times material, GE, Bombardier, and Bombardier Aerospace knew or should have known that the defects and/or dangerous conditions within the CF34 family of engines were extremely serious and, if left unaddressed, could cause in-flight engine failures. Upon information and belief, officers, directors, partners, and/or managing agents of GE, Bombardier, and Bombardier Aerospace had actual knowledge that the engines on the Subject Aircraft were defective, as alleged herein, and took affirmative steps to conceal the defect.

80.     GE deliberately limited the scope of service bulletins and safety communications to certain engine variants, creating the false impression that other CF34 variants, including the engines on the Subject Aircraft, were not at risk despite identical VGV architecture. GE failed to advise the FAA of the full scope of the corrosion hazard and its applicability across all CF34 engine variants, thereby preventing or delaying appropriate regulatory action such as mandatory inspection directives or other remedial measures.

81.     GE's conduct was intended to minimize the commercial and operational consequences of a fleetwide defect disclosure and to avoid triggering costly retrofits, warranty obligations, or loss of customer confidence.

82.     As a result of this knowing concealment and misrepresentation, operators and the FAA were deprived of critical safety information for the safety of the flight that would have mitigated or prevented the February 9, 2024 crash.

A.      **2018 Hung Start Incident**

83.     GE was aware of issues with CF34-3B engines, specifically involving hung starts, corrosion and wear in the VGV system, and saltwater and coastal environments as late as May 2019. A "hung start" refers to an instance where an engine starts but fails to accelerate to its normal idle speed. It can be an indicator of an unsafe condition.

84.     In 2018, the operator of an aircraft powered by two GE CF34-3B engines experienced hung starts on one engine at first but ultimately on both. After troubleshooting by GE, both engines were removed off wing and sent for repair.

85.     In May 2019, GE conducted an internal presentation describing the event, troubleshooting, and the findings outlining that it found: wear and corrosion of the VGV system, VG vanes that were hard to move or stuck, and severe corrosion in the upper and lower HPC cases, bores, and bushings.

86.     GE concluded that the corrosion arose due to operations in a saltwater or coastal environment. The event was also discussed in a July 2019, GE CF34 Regional Fleet Highlites article, article number 19-07-7200-03 entitled "Engine maintenance program recommendations for operations on sea/salt environment" which stated that "The vanes' inability to move as caused by the high level of corrosion. Excessive corrosion was mainly attributed to the operating environment of the engine."

87.     SB 71-0000 is the "Power Plant – General (71-00-00)- Consolidated On-Wing Inspection Recommendations and Servicing Tasks List" which described the "On-Condition" maintenance program for the CF34-3B. The original version GE SB 71-0000 was issued on January 14, 2020 and the revised version R01 on June 28, 2021 with R01 being the version in effect at the time of the accident. The R02 update was issued on April 3, 2025.

88.     Eventually in June 2021, GE released SB71-0000 R01 adding a recommendation to reduce the intervals for water washes and lubrication of external VG components on CF34 engines that are operated under 3,000ft above salt water.

89.     This service bulletin was ineffective compared to the gravity of the issue. It targeted a miniscule number of aircraft, did not address the internal components where the corrosion is most critical, was for recommendation only, as FAA, MRB, and airframer maintenance programs retained precedence, and it was issued as a category 9, the lowest level service bulletin. Additionally, the service bulletin did not provide sufficient detail, was critically vague in defining the operating area where the washes are recommended to combat corrosion, specifically the VGV System, and did not apply to Ace's geographic operating area.

90.     Further, water washes have little to no effect in mitigating the buildup of corrosion on crucial components of the CF34 VGV system due to the design of the engines. Water washes do not effectively penetrate the bore holes in the VGV system.

91.     Bombardier did not incorporate the service bulletin's recommendations into its Chapter 5 TLMC. Ace has incorporated the Bombardier TLMC into its FAA approved Maintenance and Inspection Program ("MIP"), which is a separate volume of the FAA accepted General Maintenance Manual ("GMM"), which Ace is required to follow.

**B.   GE Excludes Full Corrosion Coverage From its OnPoint Maintenance Program**

92.     Following GE's investigation of the 2018 Hung Starts, GE amended the terms of its OnPoint maintenance program to exclude full corrosion coverage from covered repairs and require water washes of the engines. The OnPoint program's coverage for corrosion is now capped at $50,000 per engine if sent to the shop and the engine owner is responsible for all costs in excess of $50,000.

93.     GE did not advise operators of the exclusion, nor the reasons.

94.     Yet, the reason to conceal and downplay the defect is apparent. Fixing corrosion in the HPC, specifically the variable geometry guide vane system, is expensive. Owners with post-2019 contracts face significant out-of-pocket repair costs, reaching up to $1,000,000 per engine.

**C.   2021 CF34-8 Incident**

95.     On August 11, 2021, a CRJ1000 commercial aircraft experienced an in-flight shutdown of one of its CF34-8 engines. Both engines utilize the same configuration and VGV system as other CF34 engines, including Plaintiffs' engines in the Subject Aircraft.

96.     GE conducted an investigation and determined the cause of the in-flight shutdown to be corrosion of the VGV system. GE issued a category 1 service bulletin, which is the highest

priority, advising only commercial airline operators to inspect, repair and replace affected components of the VGV system and adopt an enhanced maintenance program. Business jet operators were excluded from the service bulletin.

97.     The FAA issued an Emergency Airworthiness Directive requiring commercial operators to follow the same protocol, but did not require CF34-3B engines to be included and business jet operators were never advised of its existence.

### D.     The March 1, 2021 Pre-Purchase Inspection of the Subject Aircraft

98.     Commencing in November 2020 and completed on March 1, 2021, a comprehensive pre-purchase inspection of the Subject Aircraft was conducted by Duncan Aviation, an FAA authorized aircraft repair station and a GE-authorized maintenance provider, on behalf of a prospective purchaser. This inspection included a borescope examination of both CF34-3B engines as well as a detailed 192 month review of the airframe condition.

99.     The inspection revealed significant corrosion throughout the airframe, which was disclosed to the Subject Aircraft owner and prospective purchaser and ultimately caused that purchaser to withdraw from the sale. However, despite conducting the borescope inspection of the engines, neither Duncan Aviation nor GE disclosed the presence or risk of corrosion within the VGV system—even though they knew the VGV system is known to be susceptible to binding and seizure when corroded, creating a foreseeable risk of dual-engine failure.

100.     Subsequent to the Subject Incident, a review of borescope imaging from the March 1, 2021 inspection revealed that evidence of corrosion within the VGV system existed at the time but was not reported to the FAA, the aircraft owner, or any operators, nor was any service bulletin, airworthiness directive, or other safety communication issued addressing this condition.

101. As a result, the aircraft was later sold to Plaintiffs without disclosure of this critical safety hazard, depriving subsequent owners and operators—including Plaintiffs—of the ability to conduct targeted inspections or remedial maintenance to prevent the catastrophic failure that occurred on February 9, 2024.

**E.   Hop-A-Jet 2023 Hung Start Incident**

102. In July of 2023, a Challenger 650 aircraft (N858MY), operated by Plaintiff Ace Aviation, experienced a hung start on one of its CF34-3B Engines.

103. Plaintiff Ace Aviation requested GE Engine Services to perform the troubleshooting. GE Engine Services conducted on site troubleshooting and determined that the engine needed to come off wing and be input into a specialized repair facility.

104. GE Engine Services did not follow its troubleshooting procedures and test the VGV system. GE Engine Services removed the engine off wing and shipped it to GE's Strother facility for further investigation.

105. GE Engine Services opted not to test the second engine, which subsequently failed testing in March 2024.

106. GE's Strother facility determined they were not equipped to complete the necessary repairs, and at GE Engine Service's instruction, Strother shipped the engine to Standard Aero in early September 2023.

107. Standard Aero's Shop Visit Report from March 27, 2024 stated: "Subject engine was removed for a hung start experienced on-wing. The customer GE Engine Services reported issues with the Compressor Variable Geometry (VG) system. Incoming investigative findings, which are detailed in Section 3 of this report, revealed extensive corrosion on Stage 4 & 5 of the VG system which is suspected to have prohibited proper actuation of the lever arms."

108.    GE Engine Services, "the customer," therefore reported a specific issue with the VGV system to Standard Aero upon its input in early September, 2023.

109.    No tear down report was provided to Plaintiff Ace Aviation. The Shop Visit Report was not provided to Plaintiff Ace Aviation until April 17, 2025.

110.    Also, Plaintiff Ace Aviation, GE Engine Services, and Standard Aero had phone calls in late summer/early fall 2023 to discuss the status of repairs. GE Engine Services did not make Plaintiff Ace Aviation aware at any time that corrosion to the VGV system had been discovered in other CF34 engines or that the maintenance procedures being followed by Plaintiff Ace Aviation were somehow deficient.

### F.    GE Engine Services' September 2023 3200 Hour Inspection of the Subject Aircraft's Engines

111.    In September 2023, four and a half months and 357 flight hours before the accident, GE Engine Services conducted a 3200 hour inspection of both CF34-3B engines on the Subject Aircraft.

112.    GE Engine Services conducted a borescope and signed off on both engines as being problem free or not defective—that all compressor blades were considered serviceable or no defect.

113.     There was no mention of corrosion for either engine.

114.    The borescope revealed or should have revealed the corrosion on the VGV System which ultimately caused the accident. Corrosion develops over many years, not months, and therefore would have been discoverable four and a half months before the accident.

115.    GE Engine Services did not comply with FAA requirements because GE Engine Services did not maintain the borescope video and pictorial components for the requisite two-year

26

period. Plaintiff Ace Aviation does not have record of receiving video or pictures of the borescopes from GE Engine Services.

116.   GE is the author of the 3200 "on condition" inspection program and due to the 2018 Hung Start Incident and the 2021 Hung Start Incident, GE was aware of the propensity of CF34 engines to be affected by corrosion, especially of the VGV System.

117.    GE's borescope procedures are designed for GE to "find the conditions that can cause a problem with flight safety, decrease the life of a part, or cause the engine performance to become unsatisfactory." GE manual SEI-780, SM 72-00-00-Engine Inspection at Paragraph A.(4).

118.    "The most important functions of borescope inspections are: to monitor sensitive areas of the engine." *Id.* at Paragraph A.(5). GE and GE Engine Services were well aware that the VGV System and the HPC are sensitive areas of the engine.

119.   GE's Service Manual (SM 72-00-00), Engine Inspection, Paragraph 5 states

Borescope Inspection Procedures, includes the following in Table 602:
The definition of inspection terms that are used in this manual is contained in Table 602. The first column lists the terms that usually describe the deviation from normal conditions of the engine parts. The second column defines the terms. The third column lists the causes of the defined terms(conditions). Refer to Figure 614.

| Term | Definition | Causes |
|------|-----------|--------|
| Corrosion | Formation of many small pits which cumulatively create a wide cavity (usually shallow) in the surface of the part | Oxidation of particles |

120.   The inclusion of corrosion in this inspection terminology table indicates that GE recognizes corrosion as a defined condition subject to detection during inspections

### G.      January 15, 2024 Dual Hung Start and Troubleshooting on the Subject Aircraft

121.     On January 15, 2024 both engines on the Subject Aircraft suffered hung starts within approximately 30 seconds of each other. That day, the engines were initially started with no issues. The engines were subsequently shut down due to an Air Traffic Control Delay.

122.     Fifteen minutes later, the pilots attempted to start the engines and both engines suffered hung starts. Eventually after multiple attempts, the left engine started but the right engine would not. Fuel was drained from the left and right fuel collector tanks, but visual inspection showed no anomalies.

123.     On January 16, 2024, both engines again had successful cold starts. Plaintiff Ace Aviation contacted GE Engine Services to enlist their assistance in conducting troubleshooting. GE Engine Services guided Plaintiff Ace Aviation throughout all steps of the troubleshooting process and provided a technical rep to assist.

124.     GE Engine Services recommended engine fuel filter changes and the possibility of a heat-soak start. A heat-soak start is when the engine was operating, was shutdown, and then restarted before the internal temperature of the engine cools.

125.     Both engines experienced multiple successful restarts over a three day period when the heat-soak start was conducted, with all parameters normal.

126.     On January 17, 2024, fuel was collected, was sent for testing, and the results showed no anomalies. The engines started and ran at high power and all parameters were normal.

127.     Additional troubleshooting that was done was replacement of the engine fuel filters and visual inspection of the old filters.

128.    Plaintiff Ace Aviation consulted with GE Engine Services and this completed troubleshooting. GE Engine Services concurred and the airplane was returned to service. The work was signed off on January 18, 2024.

129.    GE Engine Services did not advise Plaintiff to conduct any additional troubleshooting. Maintenance Practice 68, which is a functional pressure check of the VGV System and which could only be performed by GE was not suggested or recommended notwithstanding that GE was aware of the propensity of the VGV System in CF34 engines to be adversely affected by corrosion related issues.

130.    In SEI-780 SM 72-00-00, "Fault Isolation 07 Hung Start or Slow Start," dated February 1, 2022, which was in effect during the accident and was used if a hung start is detected, had MP68 at Main logic block 21.

131.    The MP68 pressure test was one of the last items in the troubleshooting tree.

132.    After the crash, GE changed MP68 to be one of the first tasks in the troubleshooting tree, instead.

### H.    Februray 9, 2024 –Flight 823–The Subject Incident

133.    On February 9, 2024, Ace Aviation operated Hop-A-Jet Flight 823, a contracted charter flight from Columbus, Ohio, to Naples, Florida, with the Subject Aircraft.

134.    While approaching the Naples Municipal Airport, the Subject Aircraft suffered a catastrophic dual engine failure at approximately 1,000 feet, forcing the pilots to perform an emergency landing on Interstate 75. Although the Pilots miraculously saved all passengers and the flight attendant aboard the Subject Aircraft, both Pilots perished as a result of the Subject Incident.

135.    According to interviews with other Hop-A-Jet pilots, Murphy—the accident captain—was recounted as a meticulous planner, with checklist discipline described as "it was just

like you're in the flight simulator in CAE with the proper callouts and everything." First officer Hofmann was portrayed as "a very calm individual" who "was there to participate and be involved and to learn and to be an active member of the crew."[14]

136.   The cause of the Subject Incident was one or more defects and/or dangerous conditions within the engines on the Subject Aircraft. Those defects and/or dangerous conditions were only discernible through the exercise of ordinary care by: (a) those with actual or constructive knowledge of the defect and/or dangerous condition—here, GE, GE Engine Services, Bombardier, and Bombardier Aerospace; and (b) those tasked with identifying, reviewing, inspecting, maintaining, and repairing the specific location of the defects and/or dangerous conditions of the engines—here, GE Engine Services, Learjet, Turbine Engine Specialists, and Duncan Aviation.

137.   Due to GE's defective design of the HPC and VGV System, corrosion within the HPC and VG System resulted in VG guide vanes either being more in the opened or more in the closed positions than specified and prevented full travel of the VG vanes. The Subject Aircraft's engines had crevice corrosion in compressor case bore holes and the bolted flanges between the compressor and combustion case. The engines had pitting corrosion in the VGV stage 5 guide vane area. This led to a negative impact on compressor stability and caused the compressor to experience a hung start.

138.   This corrosion is what led to the catastrophic dual engine failure of the Subject Aircraft.

---

[14]   https://www.ainonline.com/aviation-news/business-aviation/2025-09-08/cl604-pilots-had-75-seconds-between-engine-warnings-and (accessed September 12, 2025).

I.      **Learjet, Turbine Engine Specialists, and Duncan Aviation missed indicators of the dangerous conditions in the engines on the Subject Aircraft.**

139.    Learjet, Turbine Engine Specialists, and Duncan Aviation are GE authorized, have substantial training, experience inspecting, testing, assessing, and maintaining engines within the CF34 family. Each was tasked with inspecting the specific location of the defects and/or dangerous conditions at issue and, upon information and belief, should have discovered such within the Subject Aircraft.

140.    Around December 2010, Learjet performed video borescope inspections of both engines on the Subject Aircraft as part of the Subject Aircraft's first 3200-hour inspection. Upon information and belief, it missed indicators of the defects and/or dangerous conditions within the engines and, instead, certified and represented the Subject Aircraft as safe for flight.

141.    Around March 2019, Turbine Engine Specialists performed "detailed" video borescope inspections of both engines on the Subject Aircraft as part of a 3200-hour inspection of the Subject Aircraft. It missed indicators of the defects and/or dangerous conditions within the engines which were readily apparent and, instead, certified and represented the Subject Aircraft as safe for flight, when it was unsafe for flight and unairworthy.

142.    Around March 1, 2021, Duncan Aviation performed video borescope inspections of both engines on the Subject Aircraft as part of a prepurchase inspection of the Subject Aircraft. It too missed indicators of the defects and/or dangerous condition(s) within the engines which were readily apparent and, instead, certified and represented the Subject Aircraft as airworthy, when it was unsafe for flight and unairworthy.

143.    Around March 20, 2021, Duncan Aviation inspected, tested, and repaired the left engine for a hung start on the Subject Aircraft at the Fort Lauderdale Executive Airport. Yet again,

it missed indicators of the defects and/or dangerous condition(s) within the engine and, instead, certified and represented the Subject Aircraft as airworthy.

**J.**     **GE Engine Services missed clear indicators of the dangerous conditions in the engines on the Subject Aircraft.**

144.    To summarize the above, in the months leading up to the Subject Incident, GE Engine Services inspected and/or guided the troubleshooting for the engines on the Subject Aircraft at least three times but failed to communicate the presence of known and/or readily discernible defects and/or dangerous conditions in the Subject Aircraft. These known defects rendered the aircraft unairworthy, and despite GE and GE Engine Service's knowledge of the defect, the Defendants certified the aircraft as airworthy.

145.    In September 2023, approximately four and a half months before the Subject Incident, GE Engine Services conducted a 3200-hour inspection of both engines on the Subject Aircraft.

146.    GE Engine Services conducted borescope inspections of both engines on the Subject Aircraft but, per maintenance records, "did not look for" the defects and/or dangerous conditions. Alternatively, GE Engine Services personnel missed indicators of the defects and/or dangerous condition(s) within the engines and, instead, certified and represented the Subject Aircraft as safe for flight, even though the defects would have rendered the aircraft unsafe for flight and unairworthy.

147.    In January 2024, just weeks before the Subject Incident, the Subject Aircraft experienced a hung start.

148.    Because of the hung start, Ace Aviation contacted GE for guidance troubleshooting the condition.

149.     GE undertook to inspect, discern, repair, address, and maintain the engines on the Subject Aircraft.

150.     GE guided Ace Aviation every step of the way through the troubleshooting process, even providing a technical representative to assist.

151.     GE neither looked for the defects and/or dangerous conditions nor instructed Ace Aviation to do so.

152.     Because GE knew of the dangerous condition with the CF34 family of engines, GE recognized or should have recognized the cause of the hung start on the Subject Aircraft as one or more defects and/or dangerous conditions in the engines.

**K.   GE's Ineffective Acts After the Subject Accident**

153.     Not only did GE fail to warn Plaintiffs about their defective engine *before* the Subject Accident, but GE also failed to adequately warn Class Members *after* the Subject Accident. Following the Subject Accident, on May 14, 2024 GE issued Category 2 Service Bulletin (Impact C) SB 72-0345, R00 "Engine – Compressor Stator (72-32-00) – One-Time Variable Geometry System Functional Check."

154.     This service bulletin was targeted at CF34-BJ engines that experienced a hung start in the 24 months preceding the bulletin, for them to perform a one-time inspection to identify possible corrosion or obstruction with the HPC case, HPC case bushing, VG stator vane spindle, and VG stator vane. If both engines had a hung start in the last 24 months, then this service bulletin had the first engine to be inspected in 10 flight cycles from May 14, 2024 and the second engine within 30 flight cycles of May 14, 2024. For aircrafts with only one affected engine the inspection was to be within 60 flights cycles of May 14, 2024.

155.     The bulletin has the inspection reports to be sent to GE once finished.

156.    The tasks of the inspection are:

Do a functional check of the variable geometry system per SM SEI-580 CF34-BJ Maintenance Manual Task 72-00-00, SPECIAL MAINTENANCE PRACTICES, paragraph 14., Variable Geometry System – Maintenance Practice 68 or SM SEI-780, 72-00-00, MAINTENANCE PRACTICE 68.

Do the functional checks and adjustments of the fuel system after maintenance using the applicable SM SEI-580, 72-00-00, TESTING, Table 503 or SM SEI-780, 72-00-00, TESTING, Figure 510, to estimate the testing necessary as it relates to hardware removed in accomplishment of this Service Bulletin.

Do an engine test as follows using SM SEI-580, 72-00-00, TESTING or SM SEI-780, 72-00-00 TESTING

> Start the engine and set at idle speed for 5 minutes.
> Increase the engine speed to make sure that the interstage turbine temperature (ITT) is set to 1501ºF (816ºC) or more. Operate the engine at this temperature for 23 minutes.
> Retard the power lever to idle speed and hold for 2 minutes.
> Shut down the engine and wait for 30 minutes.
> Start the engine.

NOTE: An engine rollover must not be done before the start procedure is tried, and the ITT must be at 248ºF (120ºC) or less before the engine ignition. This will help to keep the thermal state of the engine.

157.    This service bulletin ineffectively targeted only those aircraft which had previously recorded an experience with hung starts, not all aircraft operating in a saltwater environment and not those aircraft which had experienced a hung start followed by a successful restart (unless reported by flight crew which is not always the case

158.    The required testing also does not necessarily identify corrosion of the internal components of the VGV System but only the existence of advanced corrosion already impacting operation of the VGV system.

159.    And, crucially, it does not require ongoing periodic retesting.

160.    After the February 9, 2024 crash of the Subject Aircraft, GE revised its official engine troubleshooting guide to significantly elevate the priority of MP68, the procedure designed

34

to detect corrosion-induced binding in the VGV system. Before the crash, MP68 was listed as item number twenty-two in a sequence of more than forty possible troubleshooting steps, and GE typically did not direct operators to perform it. Following the crash, GE moved MP68 to the second position on the troubleshooting checklist, effectively acknowledging the critical role of VGV corrosion in causing catastrophic engine failures and the need for earlier detection and remediation during post-incident engine evaluations.

161.    As a direct and proximate result of the Subject Incident, Hop-a-Jet, Ace Aviation, and East Shore suffered severe, ongoing, and compounding economic and operational losses. The Subject Incident caused the total loss of the aircraft and immediate loss of fleet capacity, eliminating a critical revenue-producing asset essential to Plaintiffs' charter and business aviation operations.

162.    The Subject Incident has left Plaintiffs with permanent business impairment, including long-term loss of customers, fleet capacity, enterprise value, and market position, all of which were foreseeable and preventable had Defendants acted reasonably in the design, inspection, and maintenance guidance for the CF34 engines' VGV system.

## CLASS ACTION ALLEGATIONS

### A.  Class Definitions

163.     Pursuant to Rules 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following international economic loss class ("the Class"):

> **All persons or entities in the United States who purchased or currently own any GE CF34-3, CF34-8, or CF34-10 variant turbofan engine, or any aircraft equipped with such engines, during the applicable limitations period.**

164.     Excluded from the Class are GE, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and its employees; and the judicial officers and its immediate family members and associated court staff assigned to this case.

165.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

### B.  Numerosity

166.     Pursuant to Rule 23(a)(1), the Class is so numerous that joinder of all members is impracticable. Due to the nature of the trade and commerce involved, the members of the Class are geographically dispersed throughout the United States and the world and joinder of all Class members would be impracticable. While the exact number of class members in the Class is unknown to Plaintiffs at this time, 10,634 CF34 engines were estimated to have been delivered by GE from 1976 to 2021, with the amount still in use unknown.

167.     The amount of CF34 engines in use today is easily identifiable through GE's corporate records, such as manufacturing databases, warranty registration databases, aftermarket sales databases, self-identification, and, if necessary, license and registration databases.

### C.  Commonality/Predominance

168.     This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

- Whether the CF34 Family of engines suffer from a defective design of the HPC.

- Whether the CF34 Family of engines suffer from a defective design of the VGV System.

- Whether GE concealed the defects in the CF34 Family of turbofan engines.

- Whether there was a reasonable alternative design of the CF34 Family of turbofan engines which would prevent corrosion along the VGV System.

### D.  Typicality and Adequacy of Representation

169.     Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Plaintiffs and other class members all purchased or own a CF34 family turbofan engine. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of class litigation.

### E.  Superiority

170.     A class action is superior to individual actions for the proposed Class, in part because:

- Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and internationally; and

- The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

**F.  Requirements of Fed. R. Civ. P. 23(b)(2)**

171.    Defendant GE has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

172.    Plaintiffs and the Class further ***seek injunctive relief requiring*** GE to: Issue revised service bulletins and mandatory safety communications ***(including but not limited to, Airworthy Directives),*** to all CF34 owners, operators, and maintenance providers identifying the corrosion risks in the VGV system and the steps necessary to detect, prevent, and mitigate such hazards

173.    The requested relief is necessary to protect all Class members from ongoing safety risks, prevent future catastrophic engine failures, and restore economic losses resulting from GE's unlawful conduct.

174.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

**G.  Requirements of Fed. R. Civ. P. 23(c)(4)**

175.    Because the predominant issue regarding Defendant's liability is whether the CF34 family of turbofan engines contain an inherent defect in the VGV System, utilizing Rule 23(c)(4) to certify the Class against Defendant for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

<u>**CAUSES OF ACTION**</u>

**A.  <u>TWO CLAIMS BY *PLAINTIFFS AND THE PROPOSED CLASS*</u>**

<u>**COUNT I**</u>
<u>**(NEGLIGENCE IN DESIGN AND MANUFACTURE)**</u>
<u>**Against GE**</u>

176.     Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

177.     At all times material, GE was a designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of the CF34 family of engines, including but not limited to those engines on the Subject Aircraft.

178.     At all times material, GE placed the CF34 family of engines and their component parts into the stream of commerce with full knowledge and intent that such engines would be used and flown by purchasers, users, and operators.

179.     At all times material, GE knew or, in the exercise of reasonable care should have known, that if any of its CF34 engines or their component parts failed, it would create an unreasonable risk of harm to persons aboard the aircraft, persons in the vicinity of the aircraft, the operator of the aircraft and entities associated therewith, and those with a financial interest in the aircraft.

180.     At all times material, GE owed a duty to use reasonable care, and/or to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, inspecting, testing, and distributing its CF34 family of engines, including but not limited to those engines on the Subject Aircraft.

181.     At all times material, GE further owed a duty to:

a.     Plan, design, manufacture, integrate, assemble, modify, install, inspect, test, maintain, and/or overhaul its CF34 family of engines, including but not limited to those engines on the Subject Aircraft, so that aircraft with such engines could be safely operated;

b.     Test and/or inspect its CF34 family of engines, including those engines on the Subject Aircraft, for defects and/or dangerous conditions that existed or were likely to exist;

    c.    Modify, service, and/or repair defects and/or dangerous conditions that were known or should have been known to GE in the exercise of reasonable care; and

    d.    Otherwise ensure that the CF34 family of engines were not subject to defects and/or dangerous conditions that could lead to in-flight engine failures, serious injury, and/or death.

182.    At all times material, GE knew or should have known that an unreasonable risk of harm would result if it failed to properly plan, design, certify, manufacture, assemble, install, overhaul, modify, repair, inspect, test, and distribute its CF34 family of engines, including but not limited to those on the Subject Aircraft.

183.    At all times material, GE negligently, carelessly, and/or willfully, breached the aforementioned duties by, among other things:

    a.    Failing to plan, design, manufacture, integrate, assemble, modify, install, inspect, test, maintain, and/or overhaul its CF34 family of engines, including but not limited to those engines on the Subject Aircraft, so that aircraft with CF34 family of engines could be safely operated;

    b.    Failing to maintain and/or inspect its CF34 family of engines, including those engines on the Subject Aircraft, for defects and/or dangerous conditions that existed or were likely to exist;

    c.    Failing to modify, service, and/or repair defects and/or dangerous conditions that were known or likely to be known by GE in the exercise of reasonable care;

    d.    Failing to provide sufficient means to detect the presence of defects and/or dangerous conditions in engines within the CF34 family of engines, including those engines on the Subject Aircraft; and

    e.    Otherwise failing to ensure that the CF34 family of engines were not subject to defects and/or dangerous conditions that could lead to in-flight engine failures, serious injury, and/or death.

184.    As a direct and proximate result of GE's negligence, Class members have suffered property damage, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of businesses.

185.    As a direct and proximate result of GE's negligence, as described above, engines on Class Members' aircrafts are defective.

**COUNT II**
**(DECLARATORY AND INJUNCTIVE RELIEF)**
**Against Defendant GE**

186.    Plaintiffs incorporate and reallege all paragraphs preceding Count I as though fully set forth herein.

187.    There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

188.    Plaintiffs and the Class Members have an obvious and significant interest in this lawsuit.

189.    Plaintiffs and Class Members purchased engines from CF34 family, which had a common design defect, as further described hereinabove.

190.    If the true facts had been known, including but not limited to that the CF34 family of engines were defective and that Defendant GE was concealing the life-threatening defect, Plaintiffs and the Class would not have purchased their engines in the first place.

191.    Thus, there is a justiciable controversy over whether the CF34 family of engines are defective and whether Defendant GE concealed this defect.

192.    Defendant GE has, through uniform conduct and omissions, created ongoing and future harm affecting all members of the proposed Class, making this claim properly maintainable under Fed. R. Civ. P. 23(b)(2).

193.    The VGV system in GE's CF34 engine family—including but not limited to the CF34-3B, CF34-8, CF34-10, and CF34-C variants—shares a common, defective design that renders the engines susceptible to corrosion, binding, and seizure, creating an unreasonable risk of catastrophic engine failure across the entire fleet.

194.    GE knew or should have known of this defect but has failed to issue adequate warnings, service bulletins, or mandatory corrective measures applicable to all affected engine variants despite having knowledge that the defect posed a substantial and foreseeable risk to public safety.

195.    Plaintiffs and the Class therefore seek a declaration that:

    a.  The CF34 engine family suffers from a common design defect that renders the engines unreasonably dangerous for their intended use;

    b.  GE's failure to provide adequate warnings, service instructions, and post-sale maintenance guidance regarding VGV corrosion hazards breached its duties under federal and state law; and

    c.  GE has a continuing post-sale duty to warn and remedy such defects for all CF34 engine owners and operators, and

    d.  GE is legally obligated to implement corrective measures to protect Class members and the public from further harm.

196.    Plaintiffs and the Class further seek injunctive relief requiring GE to:

    a.  Issue revised service bulletins and mandatory safety communications to all CF34 owners, operators, and maintenance providers identifying the corrosion risks in the VGV system and the steps necessary to detect, prevent, and mitigate such hazards; and

    b.  Implement a fleetwide corrosion inspection and repair program for all CF34 engines in service, regardless of age or hours, at GE's expense;

197.    Declaratory and injunctive relief is necessary to protect the Class from continuing safety hazards, economic losses, and the risk of future catastrophic engine failures caused by GE's defective design and failure to warn.

B. **CLAIMS BROUGHT BY PLAINTIFFS INDIVIDUALLY**

A.     **GE**

**COUNT III**
**(NEGLIGENT FAILURE TO WARN)**

198.    Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

199.    At all times material, GE was a designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of the CF34 family of engines, including but not limited to those engines on the Subject Aircraft.

200.    At all times material, GE placed the CF34 family of engines and their component parts into the stream of commerce with full knowledge and intent that such engines would be used and flown by purchasers, users, and operators without the opportunity for inspection or testing.

201.    At all times material, GE knew or, in the exercise of reasonable care should have known, that if any of its CF34 engines or their component parts failed, it would create an unreasonable risk of harm to persons aboard the aircraft, persons in the vicinity of the aircraft, the operator of the aircraft and entities associated therewith, and those with a financial interest in the aircraft.

202.    At all times material, GE owed a duty to use reasonable care, and/or to exercise the highest degree of care, in certifying, inspecting, testing, maintaining, warning, and communicating with owners and operators regarding, its CF34 family of engines, including but not limited to those engines on the Subject Aircraft.

203.    At all times material, GE owed a duty to modify, service, and/or repair defects and/or dangerous conditions that were known or should have been known by GE in the exercise

of reasonable care, including but not limited to the defects and/or dangerous conditions in the engines on the Subject Aircraft.

204.    At all times material, GE owed a duty to warn and advise pilots, owners, operators, and others, including but not limited to Plaintiffs, of defects and/or dangerous conditions concerning and/or relating to GE's design, assembly, manufacture, testing, maintenance, and/or inspection of the CF34 family of engines.

205.    At all times material, GE knew or should have known that an unreasonable risk of harm would result if it failed to properly certify, inspect, test, service, maintain, warn, repair, and advise owners and operators regarding, its CF34 family of engines, including but not limited to those on the Subject Aircraft.

206.    At all times material, GE negligently, carelessly, and/or willfully, breached the aforementioned duties by, among other things:

  a.    Failing to properly certify and maintain the CF34 family of engines for continued airworthiness;

  b.    Failing to sufficiently inspect and/or test the CF34 family of engines for defects and/or dangerous conditions that could affect aircraft airworthiness;

  c.    Failing to communicate defects and/or dangerous conditions in its CF34 family of engines that were known, or should have been known, and were likely to affect aircraft airworthiness;

  d.    Failing to warn and/or advise pilots, owners, operators, and others, including but not limited to Plaintiffs, of defects and/or dangerous conditions that could affect aircraft airworthiness;

  e.    Failing to warn CF34-3B owners, operators, and pilots, including but not limited to Plaintiffs, of the significant potential for defects and/or dangerous conditions in the engines;

  f.    Failing to warn the owners, operators, and pilots of business aircraft with CF34 engines, including but not limited to Plaintiffs, of the significant potential for defects and/or dangerous conditions in the engines;

45

g.    Failing to warn governmental authorities of the risk of defects and/or dangerous conditions in engines and the concomitant risk of engine failures; and

h.    Representing the CF34 family of engines, including but not limited to those engines on the Subject Aircraft, as airworthy and safe for continued use notwithstanding the risks of severe defects and/or dangerous conditions therein.

207.    As a direct and proximate result of GE's negligence, as described above, both engines on the Subject Aircraft suffered a dual catastrophic engine failure during flight, causing the Subject Incident and Plaintiffs' substantial damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

## COUNT IV
## (STRICT LIABILITY – DESIGN AND MANUFACTURING DEFECT)

208.    Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

209.    At all times material, GE was engaged in the business of designing, manufacturing, inspecting, selling, marketing, and distributing the CF34 family of engines, including but not limited to those on the Subject Aircraft. It also authored instructions and warnings for the engines.

210.    At all times material, GE was the designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of the CF34 family of engines, including but not limited to those engines on the Subject Aircraft.

211.    At all times material, GE had the ability and right to inspect, test, address, minimize, and eliminate the risk of harm posed by defective and unreasonably dangerous conditions within engines in the CF34 family, including defective and unreasonably dangerous conditions within the engines on the Subject Aircraft.

212.    Under the conditions existing at the time of the sale, and/or delivery, the engines on the Subject Aircraft were unfit for their intended use and were in an unreasonably dangerous and defective condition; further, the instructions, warnings, and other information pertaining to the maintenance and operation of the Subject Aircraft's engines, were inadequate and unreasonably dangerous. GE failed to give Plaintiffs and others adequate warning of the nature and extent of these dangers.

213.    At all times material, and on February 9, 2024, the pilots of the Subject Aircraft were operating the Subject Aircraft as intended, and were using it in the manner for which it, and its component systems and parts, were designed, manufactured, selected, assembled, tested, distributed, and intended to be used, and in a manner reasonably anticipated and foreseeable to GE.

214.    The engines on the Subject Aircraft were in a defective and unreasonably dangerous condition in the following non-exhaustive ways:

a.    Operation of the engines could lead to the failure of one or more engines, loss of engine thrust control, and/or reduced control of the aircraft;

b.    The service, maintenance, and/or operating manuals, Aircraft Flight Manuals and documents pertaining to the engines on the Subject Aircraft failed to outline or prescribe sufficient maintenance tasks to prevent in-flight failure of the engines on the Subject Aircraft; and

c.    The engines on the Subject Aircraft did not have sufficient preventative measures to prevent the failure of one or more engines in the event of a defect and/or dangerous condition within the engine.

215.    The engines on the Subject Aircraft were defective and unreasonably dangerous when they left the possession of GE, and were expected to, and did, reach consumers, including Plaintiffs, without substantial change in condition.

216.     GE's actions (and inactions) in designing, manufacturing, inspecting, selling, marketing, maintaining, and distributing the CF34 family of engines, including but not limited to those on the Subject Aircraft, caused the defective and unsafe condition as alleged, which was the proximate cause of the Subject Incident.

217.     As a direct and proximate result of the aforementioned conduct by GE, and the aforementioned condition of the engines on the Subject Aircraft, Plaintiffs suffered substantial damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

## COUNT V
## (STRICT LIABILITY – FAILURE TO WARN)

218.     Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

219.     At all times material, GE was engaged in the business of designing, manufacturing, inspecting, selling, marketing, and distributing the CF34 family of engines, including but not limited to those on the Subject Aircraft. It also authored instructions and warnings for the engines.

220.     At all times material, GE was the designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of the CF34 family of engines, including but not limited to those engines on the Subject Aircraft.

221.     At all times material, GE had the ability and right to inspect, test, address, minimize, and eliminate the risk of harm posed by defective and unreasonably dangerous conditions within engines in the CF34 family, including defective and unreasonably dangerous conditions within the engines on the Subject Aircraft.

222.     Under the conditions existing at the time of the sale, and/or delivery, the engines on the Subject Aircraft were unfit for their intended use, and were in an unreasonably dangerous

and defective condition; further, the instructions, warnings, and other information pertaining to the maintenance and operation of the Subject Aircraft's engines were inadequate and unreasonably dangerous. GE failed to give Plaintiffs and others adequate warning of the nature and extent of these dangers.

223.   At all times material, and on February 9, 2024, the pilots of the Subject Aircraft were operating the Subject Aircraft as intended, and were using it in the manner for which it, and its component systems and parts, were designed, manufactured, selected, assembled, tested, distributed, and intended to be used, and in a manner reasonably anticipated and foreseeable to GE.

224.   The engines on the Subject Aircraft were in a defective and unreasonably dangerous condition in the following non-exhaustive ways:

  a. The maintenance, service, and/or operating manuals and documents for the Subject Aircraft (including but not limited to its engines) failed to warn of the potential for defects and/or dangerous conditions, nor did they supply an adequate checklist to address and/or remedy the risks of injury due to such conditions;

  b. The maintenance, service, and/or operating manuals for the Subject Aircraft failed to warn pilots of the potential of defects and/or dangerous conditions on the Subject Aircraft that could lead to in-flight engine failure and, were such to occur, how to maintain control of the aircraft;

  c. The operating instructions for the engines on the Subject Aircraft failed to provide recommended procedures for operation of the engines sufficient to prevent in-flight engine failures; and

  d. The maintenance manuals, instructions, guidelines, and similar materials for the Subject Aircraft failed to warn owners, operators, and pilots of aircraft with CF34-3B engines—including the Subject Aircraft—of the defects and/or dangerous conditions within CF34-3B engines.

225.     The engines on the Subject Aircraft were in a defective and unreasonably dangerous condition when they left the possession of GE, and were expected to, and did, reach the consumers, including Plaintiffs, without substantial change in condition.

226.     GE's actions (and inactions) in designing, manufacturing, inspecting, selling, marketing, maintaining, and distributing the CF34 family of engines, including but not limited to those on the Subject Aircraft, caused the defective and unsafe condition as alleged, which was the proximate cause of the Subject Incident.

227.     As a direct and proximate result of the aforementioned conduct by GE, and the aforementioned condition of the engines on the Subject Aircraft, Plaintiffs suffered substantial damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses

B.     **Bombardier**

## COUNT VI
## (NEGLIGENT FAILURE TO WARN)

228.     Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

229.     At all times material, Bombardier was a designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of Challenger 604 aircraft, including but not limited to the Subject Aircraft.

230.     At all times material, Bombardier placed Challenger 604 aircraft and their component parts into the stream of commerce with full knowledge and intent that such aircraft would be used and flown by purchasers, users, and operators without the opportunity for inspection or testing.

50

231.    At all times material, Bombardier knew or, in the exercise of reasonable care should have known, that if any of the engines on the Challenger 604 or its component parts failed, it would create an unreasonable risk of harm to persons aboard the aircraft, persons in the vicinity of the aircraft, the operator of the aircraft and entities associated therewith, and those with a financial interest in the aircraft.

232.    At all times material, Bombardier owed a duty to use reasonable care, and/or to exercise the highest degree of care, in certifying, inspecting, testing, maintaining, warning, and communicating with owners and operators regarding, Challenger 604 aircraft, including but not limited to the Subject Aircraft.

233.    At all times material, Bombardier owed a duty to modify, service, and/or repair defects and/or dangerous conditions that were known or should have been known by Bombardier in the exercise of reasonable care, including but not limited to the defects and/or dangerous conditions in the Subject Aircraft.

234.    At all times material, Bombardier owed a duty to warn and advise pilots, owners, operators, and others, including but not limited to Plaintiffs, of defects and/or dangerous conditions concerning and/or relating to Bombardier's design, assembly, manufacture, testing, maintenance, and/or inspection of Challenger 604 aircraft.

235.    At all times material, Bombardier knew or should have known that an unreasonable risk of harm would result if it failed to properly certify, inspect, test, service, maintain, warn, repair, and advise owners and operators regarding, Challenger 604 aircraft, including but not limited to the Subject Aircraft.

236.    At all times material, Bombardier negligently, carelessly, and/or willfully, breached the aforementioned duties by, among other things:

51

a.    Failing to properly certify and maintain Challenger 604 for continued airworthiness;

b.    Failing to sufficiently inspect and/or test the Challenger 604 for defects and/or dangerous conditions pertaining to the engines that could affect aircraft airworthiness;

c.    Failing to communicate defects and/or dangerous conditions in the engines on the Challenger 604 likely to affect aircraft airworthiness;

d.    Failing to warn and/or advise pilots, owners, operators, and others, including but not limited to Plaintiffs, of defects and/or dangerous conditions that could affect aircraft airworthiness;

e.    Failing to warn Challenger 604 owners, operators, and pilots of the significant potential for defects and/or dangerous conditions in the engines;

f.    Failing to warn governmental authorities of the risk of defects and/or dangerous conditions in Challenger 604 aircraft and the concomitant risk of engine failures; and

g.    Representing the Challenger 604, including but not limited to the Subject Aircraft, as airworthy and safe for continued use notwithstanding the risks of severe defects and/or dangerous conditions therein.

237.    As a direct and proximate result of Bombardier's negligence, as described above, both engines on the Subject Aircraft suffered a dual catastrophic engine failure during flight, causing the Subject Incident and Plaintiffs' substantial damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

## COUNT VII
## (NEGLIGENCE IN DESIGN AND MANUFACTURE)

238.    Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

239.   At all times material, Bombardier was a designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of Challenger 604 aircraft, including but not limited to the Subject Aircraft.

240.   At all times material, Bombardier placed the Challenger 604 aircraft and its component parts into the stream of commerce with full knowledge and intent that such aircraft would be used and flown by purchasers, users, and operators without the opportunity for inspection or testing.

241.   At all times material, Bombardier knew or, in the exercise of reasonable care should have known, that if the Challenger 604 aircraft or its component parts failed, it would create an unreasonable risk of harm to persons aboard the aircraft, persons in the vicinity of the aircraft, the operator of the aircraft and entities associated therewith, and those with a financial interest in the aircraft.

242.   At all times material, Bombardier owed a duty to use reasonable care, and/or to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, inspecting, testing, maintaining, and distributing its Challenger 604 aircraft, including but not limited to those engines on the Subject Aircraft.

243.   At all times material, Bombardier further owed a duty to:

a.   Plan, design, manufacture, integrate, assemble, modify, install, inspect, test, maintain, and/or overhaul Challenger 604 aircraft, including but not limited the Subject Aircraft, so that such aircraft could be safely operated;

b.   Test and/or inspect Challenger 604 aircraft, including but not limited to the Subject Aircraft, for defects and/or dangerous conditions that existed or were likely to exist;

c.   Modify, service, and/or repair defects and/or dangerous conditions, including those in the Subject Aircraft, that were known or should have been known to Bombardier in the exercise of reasonable care; and

      d.      Otherwise ensure that Challenger 604 aircraft were not subject to defects and/or dangerous conditions that could lead to in-flight engine failures, serious injury, and/or death.

244.     At all times material, Bombardier knew or should have known that an unreasonable risk of harm would result if it failed to properly plan, design, certify, manufacture, assemble, install, overhaul, modify, repair, inspect, test, and distribute its Challenger 604 aircraft, including the Subject Aircraft.

245.     At all times material, Bombardier negligently, carelessly, and/or willfully, breached the aforementioned duties by, among other things:

      a.      Failing to plan, design, manufacture, integrate, assemble, modify, install, inspect, test, maintain, and/or overhaul its Challenger 604 aircraft, including but not limited to the Subject Aircraft, so that that such aircraft could be safely operated;

      b.      Failing to and/or inspect its Challenger 604 aircraft, including but not limited to the Subject Aircraft, for defects and/or dangerous conditions that existed or were likely to exist;

      c.      Failing to modify, service, and/or repair defects and/or dangerous conditions that were known or likely to be known by Bombardier in the exercise of reasonable care; and

      d.      Otherwise ensuring that ensure that Challenger 604 aircraft were not subject to defects and/or dangerous conditions that could lead to in-flight engine failures, serious injury, and/or death.

246.     As a direct and proximate result of Bombardier's negligence, as described above, both engines on the Subject Aircraft suffered a dual catastrophic engine failure during flight, causing the Subject Incident and Plaintiffs' damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

## COUNT VIII
## (STRICT LIABILITY – DESIGN AND MANUFACTURING DEFECT)

247.    Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

248.    At all times material, Bombardier was engaged in the business of designing, manufacturing, inspecting, selling, marketing, and distributing the Challenger 604 and its component parts, including but not limited to the Subject Aircraft. It also authored instructions and warnings for the Challenger 604.

249.    At all times material, Bombardier was the designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of the Challenger 604, including but not limited to the Subject Aircraft.

250.    At all times material, Bombardier had the ability and right to inspect, test, address, minimize, and eliminate the risk of harm posed by defective and unreasonably dangerous conditions within the Challenger 604, including defective and unreasonably dangerous conditions within the engines on the Subject Aircraft.

251.    Under the conditions existing at the time of the sale, and/or delivery, the engines on the Subject Aircraft were unfit for their intended use and were in an unreasonably dangerous and defective condition; further, the instructions, warnings, and other information pertaining to the maintenance and operation of the Subject Aircraft's engines, were inadequate and unreasonably dangerous. Bombardier failed to give Plaintiffs and others adequate warning of the nature and extent of these dangers.

252.    At all times material, and on February 9, 2024, the pilots of the Subject Aircraft were operating the Subject Aircraft as intended, and were using it in the manner for which it, and its component systems and parts, were designed, manufactured, selected, assembled, tested,

distributed, and intended to be used, and in a manner reasonably anticipated and foreseeable to Bombardier.

253.    The Subject Aircraft was in a defective and unreasonably dangerous condition in the following non-exhaustive ways:

a.     Operation of the engines could lead to the failure of one or more engines, loss of engine thrust control, and/or reduced control of the aircraft;

b.     The maintenance, service, and operating manuals pertaining to the engines on the Subject Aircraft failed to outline or prescribe sufficient maintenance tasks to prevent in-flight failure of the engines on the Subject Aircraft;

c.     The engines on the Subject Aircraft were improperly certified as safe for flight without proper testing, both before and after they were placed into the stream of commerce;

d.     The engines on the Subject Aircraft failed to incorporate available technology and/or art that would have prevented in-flight engine failures; and

e.     The engines on the Subject Aircraft did not have sufficient preventative measures to prevent the failure of one or more engines in the event of a defect and/or dangerous condition within the engine.

254.    The engines on the Subject Aircraft were defective and unreasonably dangerous when they left the possession of Bombardier, and were expected to, and did, reach consumers, including Plaintiffs, without substantial change in condition.

255.    Bombardier's actions (and inactions) in designing, manufacturing, inspecting, selling, marketing, maintaining, and distributing the Challenger 604, including but not limited to the Subject Aircraft, caused the defective and unsafe condition as alleged, which was the proximate cause of the Subject Incident.

256.    As a direct and proximate result of the aforementioned conduct by Bombardier, and the aforementioned condition of the engines on the Subject Aircraft, Plaintiffs suffered substantial

damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

## COUNT IX
## (STRICT LIABILITY – FAILURE TO WARN)

257. Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

258. At all times material, Bombardier was engaged in the business of designing, manufacturing, inspecting, selling, marketing, and distributing the Challenger 604, including but not limited to the Subject Aircraft. It also authored instructions and warnings for the Challenger 604.

259. At all times material, Bombardier was the designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of the Challenger 604, including but not limited to the Subject Aircraft.

260. At all times material, Bombardier had the ability and right to inspect, test, address, minimize, and eliminate the risk of harm posed by defective and unreasonably dangerous conditions within engines on the Challenger 604, including defective and unreasonably dangerous conditions within the engines on the Subject Aircraft.

261. Under the conditions existing at the time of the sale, and/or delivery, the engines on the Subject Aircraft were unfit for their intended use, and were in an unreasonably dangerous and defective condition; further, the instructions, warnings, and other information pertaining to the maintenance and operation of the Subject Aircraft's engines were inadequate and unreasonably dangerous. Bombardier failed to give Plaintiffs and others adequate warning of the nature and extent of these dangers.

262.    At all times material, and on February 9, 2024, the pilots of the Subject Aircraft were operating the Subject Aircraft as intended, and were using it in the manner for which it, and its component systems and parts, were designed, manufactured, selected, assembled, tested, distributed, and intended to be used, and in a manner reasonably anticipated and foreseeable to Bombardier.

263.    The Subject Aircraft was in a defective and unreasonably dangerous condition in the following non-exhaustive ways:

a.   The service, maintenance, and operating manuals and documents pertaining to the Subject Aircraft (including but not limited to its engines) failed to warn of the potential for defects and/or dangerous conditions, nor did they supply an adequate checklist to address and/or remedy the risks of injury due to such conditions;

b.   The service, maintenance, and operating manuals for the Subject Aircraft failed to warn pilots of the potential of defects and/or dangerous conditions on the Subject Aircraft that could lead to in-flight engine failure and, were such to occur, how to maintain control of the aircraft;

c.   The operating instructions for the engines on the Subject Aircraft failed to provide recommended procedures sufficient to prevent in-flight engine failures; and

d.   The maintenance manuals, instructions, guidelines, and similar materials for the Subject Aircraft failed to warn Challenger 604 owners, operators, and pilots— including the Subject Aircraft—of the defects and/or dangerous conditions of its engines.

264.    The engines on the Subject Aircraft were in a defective and unreasonably dangerous condition when they left the possession of Bombardier, and were expected to, and did, reach the consumers, including Plaintiffs, without substantial change in condition.

265.    Bombardier actions (and inactions) in designing, manufacturing, inspecting, selling, marketing, maintaining, and distributing the Challenger 604, including but not limited to those on the Subject Aircraft, caused the defective and unsafe condition as alleged, which was the proximate cause of the Subject Incident.

266.     As a direct and proximate result of the aforementioned conduct by Bombardier, and the aforementioned condition of the engines on the Subject Aircraft, Plaintiffs suffered substantial damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses

    C.    **Bombardier Aerospace**

**COUNT X**
**(NEGLIGENT FAILURE TO WARN)**

267.     Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

268.     At all times material, Bombardier Aerospace was a designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of Challenger 604 aircraft, including but not limited to the Subject Aircraft.

269.     At all times material, Bombardier Aerospace placed Challenger 604 aircraft and their component parts into the stream of commerce with full knowledge and intent that such aircraft would be used and flown by purchasers, users, and operators without the opportunity for inspection or testing.

270.     At all times material, Bombardier Aerospace knew or, in the exercise of reasonable care should have known, that if any of the engines on the Challenger 604 or its component parts failed, it would create an unreasonable risk of harm to persons aboard the aircraft, persons in the vicinity of the aircraft, the operator of the aircraft and entities associated therewith, and those with a financial interest in the aircraft.

271.     At all times material, Bombardier Aerospace owed a duty to use reasonable care, and/or to exercise the highest degree of care, in certifying, inspecting, testing, maintaining,

warning, and communicating with owners and operators regarding, Challenger 604 aircraft, including but not limited to the Subject Aircraft.

272.   At all times material, Bombardier Aerospace owed a duty to modify, service, and/or repair defects and/or dangerous conditions that were known or should have been known by Bombardier Aerospace in the exercise of reasonable care, including but not limited to the defects and/or dangerous conditions in the Subject Aircraft.

273.   At all times material, Bombardier Aerospace owed a duty to warn and advise pilots, owners, operators, and others, including Hop-A-Jet, Ace Aviation Services, and East Shore, of defects and/or dangerous conditions concerning and/or relating to Bombardier Aerospace's design, assembly, manufacture, testing, maintenance, and/or inspection of Challenger 604 aircraft.

274.   At all times material, Bombardier Aerospace knew or should have known that an unreasonable risk of harm would result if it failed to properly certify, inspect, test, service, maintain, warn, repair, and advise owners and operators regarding, Challenger 604 aircraft, including but not limited to the Subject Aircraft.

275.   At all times material, Bombardier Aerospace negligently, carelessly, and/or willfully, breached the aforementioned duties by, among other things:

a.   Failing to properly certify and maintain Challenger 604 for continued airworthiness;

b.   Failing to sufficiently inspect and/or test the Challenger 604 for defects and/or dangerous conditions pertaining to the engines that could affect aircraft airworthiness;

c.   Failing to communicate defects and/or dangerous conditions in the engines on the Challenger 604 likely to affect aircraft airworthiness;

d.   Failing to warn and/or advise pilots, owners, operators, and others, including Hop-A-Jet, Ace Aviation, and East Shore, of defects and/or dangerous conditions that could affect aircraft airworthiness;

e.     Failing to warn Challenger 604 owners, operators, and pilots of the significant potential for defects and/or dangerous conditions in the engines;

f.     Failing to warn governmental authorities of the risk of defects and/or dangerous conditions in Challenger 604 aircraft and the concomitant risk of engine failures; and

g.     Representing the Challenger 604, including but not limited to the Subject Aircraft, as airworthy and safe for continued use notwithstanding the risks of severe defects and/or dangerous conditions therein.

276.   As a direct and proximate result of Bombardier Aerospace's negligence, as described above, both engines on the Subject Aircraft suffered a dual catastrophic engine failure during flight, causing the Subject Incident and Plaintiffs' substantial damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

## COUNT XI
## (NEGLIGENCE IN DESIGN AND MANUFACTURE)

277.   Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

278.   At all times material, Bombardier Aerospace was a designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of Challenger 604 aircraft, including but not limited to the Subject Aircraft.

279.   At all times material, Bombardier Aerospace placed the Challenger 604 aircraft and its component parts into the stream of commerce with full knowledge and intent that such aircraft would be used and flown by purchasers, users, and operators without the opportunity for inspection or testing.

280.   At all times material, Bombardier Aerospace knew or, in the exercise of reasonable care should have known, that if the Challenger 604 aircraft or its component parts failed, it would

create an unreasonable risk of harm to persons aboard the aircraft, persons in the vicinity of the aircraft, the operator of the aircraft and entities associated therewith, and those with a financial interest in the aircraft.

281.    At all times material, Bombardier Aerospace owed a duty to use reasonable care, and/or to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, inspecting, testing, maintaining, and distributing its Challenger 604 aircraft, including but not limited to those engines on the Subject Aircraft.

282.    At all times material, Bombardier Aerospace further owed a duty to:

a.    Plan, design, manufacture, integrate, assemble, modify, install, inspect, test, maintain, and/or overhaul Challenger 604 aircraft, including but not limited the Subject Aircraft, so that such aircraft could be safely operated;

b.    Test and/or inspect Challenger 604 aircraft, including but not limited to the Subject Aircraft, for defects and/or dangerous conditions that existed or were likely to exist;

c.    Modify, service, and/or repair defects and/or dangerous conditions that were known or should have been known to Bombardier Aerospace in the exercise of reasonable care; and

d.    Otherwise ensure that Challenger 604 aircraft were not subject to defects and/or dangerous conditions that could lead to in-flight engine failures, serious injury, and/or death.

283.    At all times material, Bombardier Aerospace knew or should have known that an unreasonable risk of harm would result if it failed to properly plan, design, certify, manufacture, assemble, install, overhaul, modify, repair, inspect, test, and distribute its Challenger 604 aircraft, including the Subject Aircraft.

284.    At all times material, Bombardier Aerospace negligently, carelessly, and/or willfully, breached the aforementioned duties by, among other things:

     a.     Failing to plan, design, manufacture, integrate, assemble, modify, install, inspect, test, maintain, and/or overhaul its Challenger 604 aircraft, including but not limited to the Subject Aircraft, so that that such aircraft could be safely operated;

     b.     Failing to and/or inspect its Challenger 604 aircraft, including but not limited to the Subject Aircraft, for defects and/or dangerous conditions that existed or were likely to exist;

     c.     Failing to modify, service, and/or repair defects and/or dangerous conditions that were known or likely to be known by Bombardier Aerospace in the exercise of reasonable care; and

     d.     Otherwise ensuring that ensure that Challenger 604 aircraft were not subject to defects and/or dangerous conditions that could lead to in-flight engine failures, serious injury, and/or death.

285.    As a direct and proximate result of Bombardier Aerospace's negligence, as described above, both engines on the Subject Aircraft suffered a dual catastrophic engine failure during flight, causing the Subject Incident and Plaintiffs' damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

## COUNT XII
## (STRICT LIABILITY – DESIGN AND MANUFACTURING DEFECT)

286.    Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

287.    At all times material, Bombardier Aerospace was engaged in the business of designing, manufacturing, inspecting, selling, marketing, and distributing the Challenger 604 and its component parts, including but not limited to the Subject Aircraft. It also authored instructions and warnings for the Challenger 604.

288.    At all times material, Bombardier Aerospace was the designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of the Challenger 604, including but not limited to the Subject Aircraft.

289.    At all times material, Bombardier Aerospace had the ability and right to inspect, test, address, minimize, and eliminate the risk of harm posed by defective and unreasonably dangerous conditions within the Challenger 604, including defective and unreasonably dangerous conditions within the engines on the Subject Aircraft.

290.    Under the conditions existing at the time of the sale, and/or delivery, the engines on the Subject Aircraft were unfit for their intended use and were in an unreasonably dangerous and defective condition; further, the instructions, warnings, and other information pertaining to the maintenance and operation of the Subject Aircraft's engines, were inadequate and unreasonably dangerous. Bombardier Aerospace failed to give Plaintiffs and others adequate warning of the nature and extent of these dangers.

291.    At all times material, and on February 9, 2024, the pilots of the Subject Aircraft were operating the Subject Aircraft as intended, and were using it in the manner for which it, and its component systems and parts, were designed, manufactured, selected, assembled, tested, distributed, and intended to be used, and in a manner reasonably anticipated and foreseeable to Bombardier Aerospace.

292.    The Subject Aircraft was in a defective and unreasonably dangerous condition in the following non-exhaustive ways:

   a.   Operation of the engines could lead to the failure of one or more engines, loss of engine thrust control, and/or reduced control of the aircraft;

   b.   The service, maintenance, and operating manuals for the engines on the Subject Aircraft failed to outline or prescribe sufficient maintenance tasks to prevent in-flight failure of the engines on the Subject Aircraft;

    c.   The engines on the Subject Aircraft did not have sufficient borescope ports for maintenance personnel to inspect the condition of the engine, preventing maintenance personnel from detecting the presence of defects and/or dangerous conditions in a timely manner;

    d.   The engines on the Subject Aircraft were improperly certified as safe for flight without proper testing, both before and after they were placed into the stream of commerce;

    e.   The engines on the Subject Aircraft failed to incorporate available technology and/or art that would have prevented in-flight engine failures; and

    f.   The engines on the Subject Aircraft did not have sufficient preventative measures to prevent the failure of one or more engines in the event of a defect and/or dangerous condition within the engine.

293.　The engines on the Subject Aircraft were defective and unreasonably dangerous when they left the possession of Bombardier Aerospace, and were expected to, and did, reach consumers, including Plaintiffs, without substantial change in condition.

294.　Bombardier Aerospace's actions (and inactions) in designing, manufacturing, inspecting, selling, marketing, maintaining, and distributing the Challenger 604, including but not limited to the Subject Aircraft, caused the defective and unsafe condition as alleged, which was the proximate cause of the Subject Incident.

295.　As a direct and proximate result of the aforementioned conduct by Bombardier Aerospace, and the aforementioned condition of the engines on the Subject Aircraft, Plaintiffs suffered substantial damages, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

## COUNT XIII
## (STRICT LIABILITY – FAILURE TO WARN)

296.    Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

297.    At all times material, Bombardier Aerospace was engaged in the business of designing, manufacturing, inspecting, selling, marketing, and distributing the Challenger 604, including but not limited to the Subject Aircraft. It also authored instructions and warnings for the Challenger 604.

298.    At all times material, Bombardier Aerospace was the designer, manufacturer, inspector, tester, instructions and warnings author, seller, distributor, and marketer of the Challenger 604, including but not limited to the Subject Aircraft.

299.    At all times material, Bombardier Aerospace had the ability and right to inspect, test, address, minimize, and eliminate the risk of harm posed by defective and unreasonably dangerous conditions within engines on the Challenger 604, including defective and unreasonably dangerous conditions within the engines on the Subject Aircraft.

300.    Under the conditions existing at the time of the sale, and/or delivery, the engines on the Subject Aircraft were unfit for their intended use, and were in an unreasonably dangerous and defective condition; further, the instructions, warnings, and other information pertaining to the maintenance and operation of the Subject Aircraft's engines were inadequate and unreasonably dangerous. Bombardier Aerospace failed to give Plaintiffs and others adequate warning of the nature and extent of these dangers.

301.    At all times material, and on February 9, 2024, the pilots of the Subject Aircraft were operating the Subject Aircraft as intended, and were using it in the manner for which it, and its component systems and parts, were designed, manufactured, selected, assembled, tested,

distributed, and intended to be used, and in a manner reasonably anticipated and foreseeable to Bombardier Aerospace.

302.    The Subject Aircraft was in a defective and unreasonably dangerous condition in the following non-exhaustive ways:

a.    The service, maintenance, and operating manuals and documents for the Subject Aircraft (including but not limited to its engines) failed to warn of the potential for defects and/or dangerous conditions, nor did they supply an adequate checklist to address and/or remedy the risks of injury due to such conditions;

b.    The service, maintenance, and operating manuals for the Subject Aircraft failed to warn pilots of the potential of defects and/or dangerous conditions on the Subject Aircraft that could lead to in-flight engine failure and, were such to occur, how to maintain control of the aircraft;

c.    The operating instructions for the engines on the Subject Aircraft failed to provide recommended procedures sufficient to prevent in-flight engine failures; and

d.    The maintenance manuals, instructions, guidelines, and similar materials for the Subject Aircraft failed to warn Challenger 604 owners, operators, and pilots— including the Subject Aircraft—of the defects and/or dangerous conditions of its engines.

303.    The engines on the Subject Aircraft were in a defective and unreasonably dangerous condition when they left the possession of Bombardier Aerospace, and were expected to, and did, reach the consumers, including Plaintiffs, without substantial change in condition.

304.    Bombardier Aerospace actions (and inactions) in designing, manufacturing, inspecting, selling, marketing, maintaining, and distributing the Challenger 604, including but not limited to those on the Subject Aircraft, caused the defective and unsafe condition as alleged, which was the proximate cause of the Subject Incident.

305.    As a direct and proximate result of the aforementioned conduct by Bombardier Aerospace, and the aforementioned condition of the engines on the Subject Aircraft, Plaintiffs

suffered substantial damages, including but not limited to loss of goodwill, loss of profits, loss of

substantial business, and the complete destruction of Plaintiffs' businesses

    **D.**    **Learjet**

**COUNT XIV**
**(NEGLIGENCE)**

306.    Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set

forth herein.

307.    Learjet owed Plaintiffs a duty to discover, remedy, address, and warn of defects

and/or dangerous conditions within the Subject Aircraft, including but not limited to the defects

and/or dangerous conditions that caused the Subject Incident.

308.    Upon information and belief, the defects and/or dangerous conditions that caused

the Subject Incident were discoverable through the exercise of ordinary care at the time of Learjet's

actions.

309.    Learjet negligently, recklessly, carelessly, and/or grossly breached those duties it

owed to Plaintiffs in the following non-exhaustive manner:

    a.    Failing to discover the defects and/or dangerous conditions in the engines on the Subject Aircraft;

    b.    Failing to properly inspect and/or test the engines on the Subject Aircraft;

    c.    Failing to remedy, address, warn of, and otherwise repair the dangerous condition in the engines on the Subject Aircraft; and

    d.    Certifying the Subject Aircraft as airworthy despite the obvious presence of a dangerous condition that could, and ultimately did, inhibit the safe operation of the Subject Aircraft.

310.    Learjet's negligence, recklessness, carelessness, and/or gross negligence was the

direct and proximate cause of the dual engine failure, the Subject Aircraft's crash, the deaths and

injuries of those onboard the Subject Aircraft, and all of Plaintiffs' injuries, including but not

68

limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

**E.**     **Turbine Engine Specialists**

## COUNT XV
## (NEGLIGENCE)

311.     Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

312.     At all times material, Turbine Engine Specialists was a maintenance, repair, and overhaul provider for, among other business aviation products, the CF34 family of engines and Bombardier Aerospace Challenger aircraft.

313.     At all times material, Turbine Engine Specialists owed Plaintiffs a duty to use reasonable care, and/or exercise the highest degree of care, in inspecting, discovering, servicing, repairing, and/or addressing defects and/or dangerous conditions. This duty was independent of any contractual undertaking owed by Turbine Engine Specialists to the previous owners and/or operators of the Subject Aircraft.

314.     At all times material, Turbine Engine Specialists owed Plaintiffs a duty to warn of defects and/or dangerous conditions, including but not limited to those defects and/or dangerous conditions on the Subject Aircraft. This duty was independent of any contractual undertaking owed by Turbine Engine Specialists to the previous owners and/or operators of the Subject Aircraft.

315.     At all times material, Turbine Engine Specialists negligently, recklessly, and/or carelessly breached the aforementioned duties by, among other things:

  a.     Failing to inspect and/or test the engines on the Subject Aircraft for defects and/or dangerous conditions that could affect aircraft airworthiness;

     b.      Failing to discover, recognize, and/or appreciate the gravity of, defects and/or dangerous conditions within the engines on the Subject Aircraft;

     c.      Failing to warn pilots, owners, operators, and subsequent users of the Subject Aircraft of defects and/or dangerous conditions on the Subject Aircraft that were discoverable in the exercise of ordinary care and were likely to affect aircraft airworthiness; and

     d.      Certifying the engines on the Subject Aircraft as airworthy when dangerous conditions existed within the Subject Aircraft.

316.    Had Turbine Engine Specialists exercised reasonable care, it would have discovered corrosion of the VG Systems within the engines of the Subject Aircraft.

317.    As a direct and proximate result of Turbine Engine Specialist's negligence, as described above, both engines on the Subject Aircraft suffered a dual catastrophic engine failure during flight, causing the Subject Incident and Plaintiffs' injuries.

318.    The harm suffered by Plaintiffs is not merely the economic loss of a contractual benefit that may have existed between Turbine Engine Specialists and the prior owners and/or operators of the Subject Aircraft.

**F. Duncan Aviation**

## COUNT XVI
### (NEGLIGENCE)

319.    Plaintiffs incorporate and reallege all allegations preceding Count I as if fully set forth herein.

320.    Duncan Aviation owed Plaintiffs a duty to discover, remedy, address, and warn of defects and/or dangerous conditions within the Subject Aircraft, including but not limited to the defects and/or dangerous conditions that caused the Subject Incident.

321.    The defects and/or dangerous conditions that caused the Subject Incident were discoverable through the exercise of ordinary care at the time of Duncan Aviation's actions.

322.     Duncan Aviation negligently, recklessly, carelessly, and/or grossly breached those duties it owed to Plaintiffs in the following non-exhaustive manner:

    a.     Failing to discover the defects and/or dangerous conditions in the engines on the Subject Aircraft;

    b.     Failing to properly inspect and/or test the engines on the Subject Aircraft;

    c.     Failing to remedy, address, warn of, and otherwise repair the dangerous condition in the engines on the Subject Aircraft; and

    d.     Certifying the Subject Aircraft as airworthy despite the obvious presence of a dangerous condition that could, and ultimately did, inhibit the safe operation of the Subject Aircraft.

323.     Duncan Aviation's negligence, recklessness, carelessness, and/or gross negligence was the direct and proximate cause of the dual engine failure, the Subject Aircraft's crash, the deaths and injuries of those onboard the Subject Aircraft, and all of Plaintiffs' injuries, including but not limited to loss of goodwill, loss of profits, loss of substantial business, and the complete destruction of Plaintiffs' businesses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

- That Counts 1 and 2 of this Action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- For actual damages for Plaintiffs, in an amount to be proven at trial, including but not limited to:

  - Loss of aircraft and fleet assets;

  - Loss of revenue, profits, and business opportunities;

  - Loss of company value, enterprise goodwill, and market position;

  - Costs of cleanup, remediation, and operational recovery; and

  - All other damages arising from the Subject Incident.

- For injunctive relief for Plaintiff and the Class, requiring Defendants to issue revised service bulletins, warnings, and maintenance protocols addressing the VGV corrosion hazard.

- For reasonable attorneys' fees, expert fees, litigation costs, and expenses pursuant to applicable law.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Respectfully submitted September 16, 2025.

By: *s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
Leo A. Wiesinger
Florida Bar No. 1058780
**THE MOSKOWITZ LAW FIRM PLLC**
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
Fax: (786) 298-5737
adam@moskowitz-law.com
joseph@moskowitz-law.com
leo@moskowitz-law.com
service@moskowitz-law.com

*Co-Counsel for Plaintiff*

By: */s/ Michael Rudd*
Michael Rudd
Florida Bar No. 782416
**Rudd Law, LLC**
200 South Andrews Ave., Suite 800
Fort Lauderdale, FL 33301
Tel.954-961-5059
mrudd@ruddlawyers.com

*Co-Counsel for Plaintiff*

By: */s/ William R. Scherer*
William R. Scherer
Florida Bar No. 169454
**CONRAD & SCHERER, LLP**
614 South Federal Highway
Fort Lauderdale, Florida 33301
Tel: (954) 738-8335
Fax: (954) 463-9244
wscherer@conradscherer.com
EKreiling@conradscherer.com
JLira@conradscherer.com
eservice@conradscherer.com

*Co-Counsel for Plaintiff*

By: */s/ John Scarola*
John (Jack) Scarola
Florida Bar No. 169440
Mariano Garcia
Florida Bar No. 31143
**SEARCY DENNEY SCAROLA BARNHART & SHIPLEY PA**
2139 Palm Beach Lakes Blvd.
West Palm Beach, FL 33409
Telephone: (561) 686-6300
Fax: (561) 383-9451
jsx@searcylaw.com
mxg@searcylaw.com

*Co-Counsel for Plaintiff*